UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:  Chapter 11

HAEMACURE CORPORATION,  Case No. 8:10-bk-00359-KRM

Debtor.

_____/  *Emergency Relief Requested*

DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTOR TO (A) OBTAIN SECURED POST-PETITION
FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c) AND (d), 503(b) AND 507,
(B) USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, AND (C) GRANT
ADEQUATE PROTECTION, AND (II) SCHEDULING THE FINAL HEARING

> **A hearing on this Motion will be held on January 14, 2010, at 11:15 a.m., in Courtroom 9B, Sam M. Gibbons United States Courthouse, 801 N. Florida Avenue, Tampa, Florida, before the Honorable K. Rodney May, Bankruptcy Judge.**

1. The above-captioned debtor (the "**Debtor**") hereby moves the Court, pursuant to sections 105(a), 361, 362, 363, 364(c) and (d), 503(b) and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), and rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of an interim order substantially in the form attached hereto as Exhibit A (the "**Interim Order**"), and a final order: (i) pursuant to sections 364(c) and (d) of the Bankruptcy Code, authorizing the Debtor to obtain, and approving, secured and superpriority debtor in possession financing from Angiotech Pharmaceuticals, Inc. ("**Angiotech**") pursuant to the Credit Agreement (defined below); (ii) pursuant to section 363 of the Bankruptcy Code, authorizing and approving the Debtor's use of Cash Collateral (defined below) of Angiotech as pre-petition lender to the Debtor; (iii) authorizing adequate protection for Angiotech; (iv) scheduling interim and final hearings on this Motion (the "**Motion**"); and (v) authorizing other necessary and related relief detailed herein.

## INTRODUCTION

2.  The preservation and maximization of the going concern value of the Debtor's business, including the preservation of key business relationships, are among the Debtor's primary goals in its chapter 11 case. In support of these goals, the Debtor wishes to avoid interruptions in its operations, to provide seamless service and an uninterrupted flow of products to the Debtor's customers and to minimize any adverse business effects of its chapter 11 filing to the fullest extent possible.

3.  The Debtor's use of Cash Collateral alone would not produce sufficient liquidity to meet the Debtor's immediate and anticipated cash requirements. The Debtor therefore seeks authorization to enter into the proposed DIP Credit Facility (defined below) to provide the Debtor with the liquidity necessary for it to operate during chapter 11. With the funds from the DIP Credit Facility, the Debtor will have sufficient opportunity to begin the process of seeking to sell its assets and business as a going concern. By contrast, a failure to secure the DIP Credit Facility would likely result in liquidation, with attendant employee dislocation and acute losses for vendors and customers. Accordingly, the Debtor requests approval of the DIP Credit Facility, including interim approval to enable it to draw under the DIP Credit Facility, so that it may avoid this immediate and irreparable harm.

## SUMMARY STATEMENT OF RELIEF REQUESTED

4.  In accordance with Bankruptcy Rules 4001(c)(1) and (d)(1)(B), the Debtor submits this statement of the relief requested herein. This summary statement is qualified in all respects by the terms of this Motion, the Interim Order, and the Credit Agreement, which shall govern in the event of any inconsistency.

5. The Debtor, the Debtor's parent company, Haemacure Corporation, a corporation duly incorporated under the Canada Business Corporations Act ("**Haemacure-Canada**" or "**Parent**") and Angiotech are parties to that certain Senior Secured Convertible Bridge Loan dated as of June 1, 2009, a copy of which is attached hereto as Exhibit B (the "**June 1 Agreement**"), as modified and amended by that certain Letter Agreement dated as of January 7, 2010 among Angiotech, Parent and the Debtor, a copy of which is attached hereto as Exhibit C (the "**Letter Agreement**"), and that certain Forbearance Agreement dated as of January 8, 2010, a copy of which is attached hereto as Exhibit D (the "**Forbearance Agreement**" and together with the June 1 Agreement and the Letter Agreement, collectively, the "**Credit Agreement**").

6. The Debtor requests authority to borrow up to the remaining amount available under the Credit Agreement of approximately $817,000 in secured and superpriority debtor-in-possession financing (the "**DIP Credit Facility**") from Angiotech on substantially the terms set forth in the Credit Agreement, as modified by the Interim Order, and a final order (the "**Final Order**") to be entered after a final hearing on this Motion (the "**Final Hearing**"). The Debtor also requests ability to use "cash collateral" constituting collateral under the terms of the Credit Agreement ("**Cash Collateral**"), on substantially the terms set forth in the Credit Agreement, as modified by the Interim Order and the Final Order.

7. The following table lists the material provisions of the DIP Credit Facility (including those provisions specified in Bankruptcy Rule 4001(c)(1)) and the proposed use of Cash Collateral and identifies their location within the June 1 Agreement and/or the Interim Order, or elsewhere:

| Provision | Description | Location |
|---|---|---|
| Borrower | Haemacure-Canada and/or Debtor | June 1 Agreement 1st Paragraph & ¶1.01(7) |

| Guarantor | Debtor | June 1 Agreement ¶1.01(71) |
|---|---|---|
| DIP Lender | Angiotech Pharmaceuticals, Inc. | June 1 Agreement 1st Paragraph & ¶1.01(43) |
| Outstanding Balance under the Credit Agreement | $2,793,672.92 as of January 8, 2010 (includes accrued interest) | Interim Order Finding ¶ J (iii) |
| Amount and Availability of DIP Credit Facility | Up to $817,000 of available amounts under the Credit Agreement. Draws may be made by request to Angiotech as provided for under the "Second Borrowing" in the June 1 Agreement | June 1 Agreement ¶2.01, Interim Order ¶2(c) |
| Purpose/Use of Proceeds | (i) To provide working capital, (ii) for other general corporate purposes, including payment of professionals' fees and expenses, and (iii) to pay transaction costs, fees and expenses incurred in connection with the DIP Credit Facility. | June 1 Agreement ¶4.06(1) |
| Amortization | NONE | June 1 Agreement ¶4.01(2) |
| Maturity | Earliest of (i) March 31, 2010, (ii) default under Credit Agreement or Termination Date under Interim Order, (iii) effective date of a plan of reorganization of Debtor or the emergence of Debtor from bankruptcy, and (iii) acceleration of the loan and termination of the commitments under the DIP Credit Facility. | Interim Order ¶¶2(d), 18 |
| Interest Rate | As provided in the June 1 Agreement, as modified by the Forbearance Agreement. | Interim Order ¶2(g) |
| Fees | NONE | |
| Prepayments – Voluntary | Loans may be prepaid in whole or in part without premium or penalty. | |
| Security/Lien Priority | DIP Credit Facility to be secured, by all assets of the Debtor.<br><br>The DIP Credit Facility will not be secured by avoidance actions or the proceeds therefrom.<br><br>Pursuant to section 364(d) of the Bankruptcy Code, the liens securing the DIP Credit Facility will be *pari passu* with the liens under the June 1 Agreement.<br><br>If final approval of the DIP Credit Facility is denied, liens remain in effect to secure amounts funded and borrowed. | June 1 Agreement ¶9.01, Interim Order ¶7<br><br>Interim Order ¶7<br><br>Interim Order ¶24 |

| | | |
|---|---|---|
| Priority | In addition to the liens described above, advances under the DIP Credit Facility will be entitled pursuant to section 364(c)(1) of the Bankruptcy Code to a "super-priority" claim. | Interim Order ¶6 |
| | If final approval of the DIP Credit Facility is denied, priorities remain in effect as to amounts funded and borrowed. | Interim Order ¶24 |
| Carve-Out | Includes (i) up to $20,000 for Debtor's counsel fees and expense incurred after the occurrence of termination of the DIP Credit Facility, plus any unpaid fees and expenses incurred prior to a termination of the DIP Credit Facility; (ii) fees of the U.S. Trustee and the Clerk of the Court. | Interim Order ¶[_] |
| Section 506(c) Waiver | Debtor waives ability to assert any claim pursuant to Section 506(c). | Interim Order ¶10 |
| Waiver of Perfection Requirement | Liens of Angiotech are deemed fully perfected by virtue of entry of the Interim Order. | Interim Order ¶16 |
| Representations and Warranties | As provided in the June 1 Agreement, as modified by the Forbearance Agreement. | June 1 Agreement Article Seven |
| Covenants | As provided in the June 1 Agreement, as modified by the Forbearance Agreement. | June 1 Agreement Article Eight |
| Events of Default | As provided in the June 1 Agreement, as modified by the Forbearance Agreement. | June 1 Agreement ¶10.01 |
| Remedies Upon Maturity or Default | As provided in the June 1 Agreement, as modified by the Forbearance Agreement. | June 1 Agreement ¶10.02 |
| Indemnity | As provided in the June 1 Agreement, as modified by the Forbearance Agreement. | June 1 Agreement ¶11.03 |
| Use of Cash Collateral and Grant of Adequate Protection | Debtor will be permitted to utilize Cash Collateral for the same purposes as permitted for the Credit Agreement and the DIP Credit Facility. Adequate protection will include replacement liens in collateral and super-priority claims. | Interim Order ¶8 |
| Limitations on Challenge | 30 day period from entry of Interim Order for Committee/other parties to challenge claims/liens; release of Debtor's claims against Angiotech | Interim Order ¶11 |

# BACKGROUND

## Jurisdiction and Venue

8. This Court has jurisdiction over the subject matter of this Motion under 28 U.S.C. §§ 157 and 1334. This Motion concerns a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue for this matter is proper in this district pursuant to 28 U.S.C. § 1409.

## General Background

9. On January 8, 2010 (the "**Petition Date**"), the Debtor filed with this Court its Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code.

10. The Debtor continues to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11. The Debtor is a wholly-owned subsidiary of Haemacure–Canada (the "**Parent**" and together with the Debtor, hereinafter collectively referred to as "**Haemacure**").

12. Haemacure is a specialty bio-therapeutics company developing high-value human biological adhesives, hemostats and therapeutic proteins for commercialization. Haemacure's research and development effort is driven by its proprietary, high-yield plasma protein extraction technology to develop next-generation products` including surgical hemostats.

13. Haemacure's lead product candidate, *Hemaseel®HMN*, is a human-derived fibrin sealant planned to enter pivotal Phase II/Phase III clinical trials. Fibrin sealant is a biological adhesive with sealing and hemostatic properties which are essential to wound healing. Haemacure's second product candidate, *Hemaseel®Thrombin*, is a hemostatic agent now in pre-clinical stage, and consists of human thrombin, a component of its fibrin sealant.

14. Haemacure's product development activities will focus on the use of its fibrin sealant in adhesion prevention, aesthetics, combination with biomaterials, drug delivery,

regenerative medicine, skin graft fixation for burn injuries, surgical hemostasis and wound healing. Haemacure has also identified eleven specialty proteins and enzymes in one of its two plasma fractions and seeks to advance these specialty proteins through partnerships with pharmaceutical and biotechnology companies.

15. The Debtor operates a manufacturing facility of approximately 52,000 square feet located at 600 Tallevast Road, Suite 201, in Sarasota, Florida.

16. As of November 30, 2009, the Debtor's balance sheet reflected total assets of approximately $9 million and total liabilities of approximately $47 million.

17. As of the Petition Date, the Debtor owed approximately $47 million in unsecured obligations and had guaranteed approximately $2.8 million owed to Angiotech by the Parent.

18. On January 11, 2010, the Debtor and Angiotech executed a Purchase Agreement (the "**Purchase Agreement**"), which provides, subject to the approval of this Court, for the sale by the Debtor, and the purchase by Angiotech, of substantially all of the assets of the Debtor for a purchase price of $1,500,000 plus the assumption of certain liabilities of the Debtor.

**The Debtor's Pre-Petition Secured Financing**

19. As described above, as of the Petition Date, the Debtor and the Parent were party to the Credit Agreement among Haemacure-Canada, as borrower (the "**Borrower**"), the Debtor, as guarantor, and Angiotech, as lender (the "**Lender**").[1]

20. Pursuant to the Credit Agreement, Angiotech provided a non-revolving senior secured convertible bridge loan (a) in the principal amount of US$2,500,000 to be advanced to the Borrower by the Lender in multiple drawdowns (collectively, the "**Initial Borrowing**") and (b) in

---

[1] While the Debtor has made every effort to be accurate, the Debtor's description of the Credit Agreement and the other loan documents described herein is qualified in all respects by the actual terms and provisions thereof.

the additional principal amount of up to US$1,000,000 to be advanced in multiple drawdowns, from time to time, to the Borrower by the Lender, at the sole discretion of the Lender (the "**Second Borrowing**"). Pursuant to the Letter Agreement, Angiotech has advanced $183,000 ($123,500 to Parent and $59,500 to the Debtor) from amounts available under the Second Borrowing, leaving a remaining balance of $817,000.

21. Pursuant to a certain Continuing, Absolute and Unconditional Guaranty dated as of June 1, 2009, the Debtor guaranteed the obligations of Haemacure-Canada under the Credit Agreement (the "**Pre-Petition Guaranty**"). Pursuant to a Security Agreement also dated as of June 1, 2009 (the "**Pre-Petition Security Agreement**") in favor of Angiotech, the Debtor and Haemacure-Canada, as grantors, granted Angiotech, as security for the obligations of Haemacure-Canada under the Credit Agreement and the Debtor under the Pre-Petition Guaranty (such obligations existing as of the Petition Date being referred to herein as the "**Pre-Petition Obligations**"), a lien on and security interest in, the Collateral[2] (the Collateral owned or acquired

---

[2] "Collateral" is defined in section 2.1 of the Pre-Petition Security Agreement as follows:

    (a) all property of, or for the account of, the Debtor now or hereafter coming into the possession, control or custody of, or in transit to, the Secured Party or any agent or bailee for the Secured Party or any parent, affiliate or subsidiary of the Secured Party or any participant with the Secured Party in the Obligations (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise), including all earnings, dividends, interest, or other rights in connection therewith and the products and proceeds therefrom, including the proceeds of insurance thereon; and

    (b) the additional property of the Debtor, whether now existing or hereafter arising or acquired, and wherever now or hereafter located, together with all additions and accessions thereto, substitutions, betterments and replacements therefor, products and Proceeds therefrom, and all of the Debtor's Books and Records and recorded data relating thereto (regardless of the medium of recording or storage), together with all of the Debtor's right, title and interest in and to all computer software required to utilize, create, maintain and process any such records or data on electronic media, identified and set forth as follows:

        (i) All Accounts and all Goods whose sale, lease or other disposition by the Debtor has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, the Debtor, or rejected or refused by an Account Debtor;

        (ii) All Inventory, including raw materials, work-in-process and finished goods;

(continued...)

by the Debtor or Haemacure-Canada as of the Petition Date, or in which Haemacure-Canada or the Debtor has any right, title or interest as of the Petition Date, being referred to herein as the "**Pre-Petition Collateral**").

22. As of January 8, 2010, Haemacure-Canada was indebted to Angiotech under the June 1 Agreement in the aggregate amount of not less than $2,683,000, plus interest, costs, expenses and other charges thereon, which amounts are guaranteed by the Debtor under the Pre-Petition Guaranty. The foregoing obligations, together with, as of the Petition Date, all other

---

(iii) All Goods (other than Inventory), including embedded software, Equipment, vehicles, furniture and Fixtures;

(iv) All Software and computer programs;

(v) All Investment Related Property (whether consisting of certificated securities or uncertificated securities) and Deposit Accounts;

(vi) All Chattel Paper, Electronic Chattel Paper, Instruments, Documents, Letter of Credit Rights, all proceeds of letters of credit, Health-Care-Insurance Receivables, Supporting Obligations, notes secured by real estate, Commercial Tort Claims and General Intangibles, including Payment Intangibles; and

(vii) All of the proceeds (as that term is defined in the UCC) and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance or Commercial Tort Claims covering or relating to any or all of the foregoing, and any and all Accounts, Books, Chattel Paper, Deposit Accounts, Equipment, General Intangibles, Inventory, Investment Related Property, Negotiable Collateral, Supporting Obligations, money or other tangible or intangible property resulting from the sale, lease, license, exchange, collection or other disposition of any of the foregoing, whatever is collected on, or distributed on account of ,any of the foregoing, any and all rights arising out of the foregoing, the proceeds of any award in condemnation with respect to any of the foregoing, any rebates or refunds, whether for Taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and the proceeds thereof, claims arising out of the loss, non-conformity, or interference with the use of, defects, or infringement of rights in, or damage to, any of the foregoing, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, insurance, or guaranty payable by reason of loss or non-conformity of, defects or infringement of rights in, or damage to, or otherwise with respect to any of the foregoing (the "Proceeds"). Without limiting the generality of the foregoing, the term "Proceeds" includes whatever is receivable or received when Investment Related Property or proceeds are sold, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes proceeds of any indemnity or guaranty payable to any Person from time to time with respect to any of the Investment Related Property.

indebtedness and other obligations of the Debtor under the Credit Agreement, including, but not limited to, fees, costs and expenses (including, but not limited to, attorneys' fees and expenses), and other charges, amounts and costs owing, accrued, accruing or chargeable in respect thereof, of any kind or nature, whether existing or contingent, payable to or for the benefit of any person or entity, pursuant to any of the foregoing agreements, instruments or documents, is herein referred to as the "**Senior Secured Indebtedness**."

23. The Senior Secured Indebtedness is secured by all of the Pre-Petition Collateral owned or acquired by the Debtor as of the Petition Date and products and proceeds thereof. Angiotech's lien and security interest in the Pre-Petition Collateral was duly perfected, and the first priority liens and security interests in and upon the Pre-Petition Collateral are herein collectively referred to as the "**Pre-Petition Senior Liens**." Angiotech filed UCC Financing Statement No. 2009-1696878 on May 29, 2009 with the Delaware Secretary of State with respect to the Pre-Petition Collateral.

## The Debtor's Liquidity Needs

24. The Debtor's financial position has deteriorated during 2009 due to its inability to obtain the additional financing necessary to continue to develop its products, resulting in a severe lack of liquidity that has necessitated the filing of this chapter 11 case.

25. The Debtor has, with the assistance of its advisors, analyzed its cash needs to enable it to maintain its operations in chapter 11 and to complete a sale of its assets and business as a going concern within approximately two to three months.

26. In determining the amount of liquidity needed, the Debtor and its advisors have analyzed details of its projected operating expenses and other costs related to its bankruptcy case.

The Debtor also conferred with individuals in the Debtor's operations and management with respect to key business drivers in the near term.

27. To assess its immediate funding needs, the Debtor and its advisors developed a 6-week cash flow forecast taking into account anticipated cash receipts and disbursements. The Debtor analyzed the impact of a bankruptcy filing on changes in working capital and other material cash disbursements. The Debtor identified other potential cash outlays that would increase the amount of cash necessary to maintain operations over this period and throughout the next two to three months, including operating expenses, vendor payments, professional fees, and other material disbursements.

**The Debtor's Efforts to Obtain DIP Financing**

28. Obtaining debtor in possession-financing in the current credit and capital markets environment is exceedingly difficult. Nevertheless, the Debtor and its advisors evaluated all realistic options for obtaining the necessary financing.

29. It was clear from the outset that no entity would consider providing the Debtor with DIP financing without obtaining first-priority liens on substantially all of the Debtor's property. Therefore, the Debtor and its professionals negotiated extensively with Angiotech to obtain credit on the best terms possible. Those negotiations were extensive, comprehensive, at arm's length and in good faith.

## RELIEF REQUESTED AND BASIS THEREFOR

30. The Debtor respectfully requests that the Court enter the Interim Order, and after the Final Hearing, enter the Final Order:

(a) pursuant to sections 364(c) and (d) of the Bankruptcy Code, authorizing the Debtor to obtain, and approving, the DIP Credit Facility pursuant to the terms of the Credit Agreement, as modified by the Interim Order and the Final Order;

(b) pursuant to section 363 of the Bankruptcy Code, authorizing and approving the Debtor's use of Cash Collateral of Angiotech, as Debtor's pre-petition lender;

(c) authorizing adequate protection for Debtor's use of Cash Collateral of Angiotech;

(d) scheduling interim and final hearings on the Motion; and

(e) authorizing other necessary and related relief detailed herein.

**The DIP Credit Facility Should be Authorized**
**Under Bankruptcy Code Sections 364(c) and (d)**

31. As a condition to entering into the DIP Credit Facility and obtaining the Debtor's needed liquidity, the Debtor must obtain authorization pursuant to subsections 364(c) and (d) of the Bankruptcy Code, which permit a debtor-in-possession to grant (among other unsecured and lien priorities), in return for postpetition financing, superpriority administrative status and liens equal in priority to existing liens.

32. Section 364(c) of the Bankruptcy Code provides in relevant part:

> (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
> (1) with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

33. Section 364(d) of the Bankruptcy Code provides in relevant part:

(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –

    (A) the trustee is unable to obtain such credit otherwise; and

    (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

*The Debtor Exercised Proper Business Judgment and*
*the DIP Credit Facility Terms are Fair and Reasonable*

34. Pursuant to section 364(c) of the Bankruptcy Code, a debtor may, in the exercise of its business judgment and so long as the credit sought is consistent with the provisions of, and policies underlying the Bankruptcy Code, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estate. *See e.g., In re Simasko Production Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) (authorizing interim financing agreement where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *see also* 3 Collier on Bankruptcy ¶ 364.04 (15th ed. rev.).

35. Courts also have examined proposed debtor in possession financing under a three-part inquiry, considering whether:

    (a) the debtor cannot obtain credit unencumbered or without superpriority status;

    (b) the credit transactions are necessary to preserve assets of the estate; and

    (c) the terms of the credit agreements are fair, reasonable and adequate.

3 Collier on Bankruptcy ¶ 364.04[1] (15th ed. rev. 2008) (citing *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987)).

36. Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money. *See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550-51 (1943); *Simasko Production Co.*, 47 B.R. at 444 ("Business judgments should be left to the board room and not to this Court"); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (Same); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the Debtors' estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estates, and threaten the court's ability to control a case impartially.").

37. In general, a bankruptcy court should defer to a debtor's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Frostbaum v. Ochs*, 277 B. R. 470, 475-76 (E.D.N.Y. 2002) (quoting *In re Curlew Valley Assocs.*, 14 B.R. 506).

38. Here, the Debtor has exercised sound business judgment in determining that the proposed DIP Credit Facility is appropriate and has satisfied the legal prerequisites to obtain the requested credit. This most critical matter was considered by the Debtor's management and subjected to scrutiny by experienced professionals before approval. The Debtor's decision to agree

to the DIP Credit Facility is reasonable under the circumstances, where no financing was available on more favorable terms.

39. In order to satisfy the standards of section 364(c) of the Bankruptcy Code, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available of the type set forth in section 364(b) of the Bankruptcy Code. *See, e.g., In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *In re Ames Dept. Stores, Inc.*, 115 B.R. at 40 (debtors demonstrated the unavailability of unsecured financing where debtors approached several lending institutions). The Debtor's efforts to search for potential alternatives to the DIP Credit Facility were reasonable, particularly under the prevailing credit and capital markets environment.

40. Moreover, the terms of the DIP Credit Facility are fair and reasonable in light of current market conditions (particularly the lack of a ready market for any financing, including debtor in possession financing) and are in the best interests of the Debtor's estate.

41. The post-petition financing requested herein is essential to the orderly continuation of the Debtor's business operations with minimal disruption and is necessary for the management and preservation of the assets of its estate. Moreover, the Debtor, exercising its prudent business judgment, believes the financing is fair, reasonable, necessary and appropriate. Finally, after reasonable efforts under the circumstances, the Debtor was unable to obtain from any other qualified lenders the necessary financing in exchange only for section 503(b)(1) administrative expense priority. Accordingly, the Debtor has satisfied the requirements of section 364(c).

*The Debtor Has Satisfied the Requirements*
*of Section 364(d) of the Bankruptcy Code*

42. With respect to the first requirement of section 364(d), set forth in subparagraph (d)(1)(A), the Debtor is unable to obtain DIP financing without providing liens on a *pari passu* with the liens of Angiotech, as the pre-petition lender. The Debtor has made all reasonable efforts to obtain financing on the best terms available in light of market circumstances as described herein. The evidence establishes that the Debtor could not obtain alternative financing without providing senior priming liens and that, in such a situation, the value of the Debtor's assets is not sufficient to grant Angiotech adequate protection of its existing secured claims.

43. Angiotech has agreed to provide post-petition financing on the basis of the proposed forms of adequate protection provided in this Motion.

44. In light of the forms of adequate protection that the Debtor proposes to provide Angiotech, as the pre-petition lender, including the grant of the *pari passu* liens, the Debtor believes that it has satisfied section 364(d)(1)(B).

**The DIP Credit Facility Should Be Accorded the**
**Protections of Section 364(e) of the Bankruptcy Code**

45. The terms of the DIP Credit Facility were negotiated in good faith and at arm's length between the Debtor and Angiotech, and all of the credit under the DIP Credit Facility will be extended by Angiotech in good faith (as such term is used in section 364(e) of the Bankruptcy Code). No consideration is being provided to any party to, or guarantor of, obligations arising under the DIP Credit Facility, other than as provided herein. Finally, the DIP Credit Facility is being provided in reliance upon the protections offered by section 364(e). Thus, Angiotech should be entitled to the full protection of section 364(e) in the event that the Interim Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise.

## Interim Approval of the DIP Credit Facility and Use of Cash Collateral
## Will Prevent Immediate and Irreparable Harm to the Debtor's Estate

46. Pursuant to Bankruptcy Rules 4001(b) and (c), a minimum of fifteen (15) days' notice is required before a final hearing on this Motion may commence. However, the rule provides that the Court may conduct a hearing before the fifteen (15) days period expires, but may authorize the use of only that amount of cash collateral and DIP financing to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing. Bankruptcy Rule 4001(b)(2), (c)(2).

47. As noted above, to assess its immediate funding needs, the Debtor and its advisors developed a 6-week cash flow forecast taking into account anticipated cash receipts and disbursements. The Debtor analyzed the impact of a bankruptcy filing on changes in working capital and other material cash disbursements. The Debtor identified other potential cash outlays that would increase the amount of cash necessary to maintain operations over this period and throughout the next two to three months, including operating expenses, vendor payments, professional fees, and other material disbursements. The requested interim availability under the DIP Credit Facility totals approximately $214,000 in term loans, in addition to use of Cash Collateral. A copy of the 6-week cash flow forecast is attached hereto as <u>Exhibit E</u>. These funds will help provide assurances to the Debtor's suppliers, vendors and employees that they will be paid for post-petition services. These assurances are essential to the Debtor's efforts to persuade its vendors to continue shipping goods and providing services to the Debtor on customary trade credit. The liquidity provided by the DIP Credit Facility will provide assurances to the Debtor's customers that the Debtor will be able to deliver products during this chapter 11 case. Approval of interim borrowing thus is crucial to maximizing the value of the Debtor's estate.

48. For these reasons, failure to approve the DIP Credit Facility and use of Cash Collateral on an interim basis will result in immediate and irreparable harm to the Debtor's estate.

## NOTICE

49. No trustee or examiner has been appointed in this case, and no official committees have yet been appointed pursuant to Section 1102 of the Bankruptcy Code. Notice of this Motion has been given by (i) electronic transmission to the Office of the United States Trustee for the Middle District of Florida, and (ii) United States first class mail to the Debtor and all creditors of the Debtor and certain other parties (all as listed on Schedule 1 attached hereto). The Debtor submits that, given the administrative nature of the relief requested herein, no other or further notice need be given.

WHEREFORE, for all the foregoing reasons, the Debtor respectfully requests that the Court enter an order granting the relief requested herein and such other and further relief as the Court deems just and equitable.

Dated: January 12, 2010

/s/ Charles A. Postler
Charles A. Postler (Fla. Bar No. 455318)
cpostler@srbp.com
STICHTER, RIEDEL, BLAIN
  & PROSSER, P.A.
110 Madison Street, Suite 200
Tampa, Florida 33602
PH    (813) 229-0144
FAX   (813) 229-1811
Attorneys for the Debtor

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing **Debtor's Emergency Motion for Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Secured Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c) And (d), 503(b) and 507, (B)**

**Use Cash Collateral Pursuant to 11 U.S.C. § 363, and (C) Grant Adequate Protection, and (II) Scheduling the Final Hearing** has been furnished on this 12th day of January, 2010, by (i) the Court's CM/ECF Transmission with attached Exhibits A to E to the Office of the United States Trustee and (ii) U.S. Mail (without attached Exhibits A to E unless received by the following parties by CM/ECF Transmission) to all parties set forth on Schedule 1 attached hereto.

/s/ Charles A. Postler
Charles A. Postler