**EXHIBIT A**

# PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (the "Agreement") is entered into as of the 11th day of January, 2010, by and between HAEMACURE CORPORATION, a Delaware corporation (which, together with its successors and assigns, is referred to herein as the "Seller"), and ANGIOTECH PHARMACEUTICALS, INC., a corporation incorporated under the laws of the Province of British Columbia (which, together with its successors and assigns, is referred to herein as the "Purchaser").

## RECITALS

A.    Seller, together with HAEMACURE CORPORATION, a corporation duly incorporated under the Canada Business Corporations Act ("Haemacure-Canada"), is a development-stage specialty biotherapeutics company developing high-value, human therapeutic proteins for commercialization, based on its proprietary, high-yield fibrinogen and thrombin extraction and purification technology (the "Business").

B.    Subject to the terms and conditions set forth in this Agreement, the Purchaser desires to purchase and acquire, and the Seller desire to sell and transfer, certain assets of Seller used in or arising out of the conduct of the Business.

C.    Subject to the execution of this Agreement, Seller will file a voluntary petition for relief (the "Petition") under Chapter 11 of The Bankruptcy Reform Act of 1978, as amended (the "Bankruptcy Code") with the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court").

D.    Contemporaneously with the Petition, Haemacure-Canada intends to file a Notice of Intention to file a Proposal (the "NOI") under the Canadian Bankruptcy and Insolvency Act ("BIA") and to seek the appointment of PricewaterhouseCoopers as trustee.

E.    It is the intention of the parties that the sale of assets of Seller to Purchaser contemplated hereby be made pursuant, and subject, to the provisions of Section 363 of the Bankruptcy Code.

## PROVISIONS

In consideration of the mutual covenants contained herein, and intending to be legally bound hereby, the Purchaser and Seller hereby mutually agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01    Certain Defined Terms. As used in this Agreement, the following terms shall have the meanings ascribed to them in this Section 1.01:

"Action" means any legal action, suit, arbitration, inquiry, proceeding or investigation by or before any court, any governmental or other regulatory or administrative agency or commission or any arbitration tribunal.

"Alternative Transaction" means any transaction, other than as contemplated under the terms of this Agreement or as otherwise proposed by the Purchaser, relating to (a) the merger, consolidation or business combination of the Seller with any Person, (b) the sale or other disposition of 50% or more of the Transferred Assets pursuant to one or more transactions, or (c) the sale of 50% or more of the outstanding shares of capital stock of the Seller (including, without limitation, by way of a tender offer, foreclosure or plan of reorganization or liquidation).

"Assumed Liabilities" means only those liabilities and obligations of the Seller as described in Section 2.03 hereof, the liability for which is to be assumed by the Purchaser as provided under the provisions of Section 2.03 hereof.

"Bankruptcy Rules" mean the Federal Rules of Bankruptcy Procedure.

"Closing" shall have the meaning specified in Section 2.01 hereof.

"Closing Date" shall have the meaning specified in Section 2.01 hereof.

"Company Liabilities" means all debts, liabilities and obligations of the Seller, or arising out of the operations of Seller, whether prior to or after the Closing Date, whether known or unknown, contingent or matured, of any nature whatsoever, whether asserted prior to, at or after Closing, including, without limitation: (a) all liabilities and obligations in the nature of trade payables for goods or services sold or provided to Seller, (b) all liabilities, obligations and commitments of Seller arising out of or relating to goods ordered by Seller, (c) all liabilities, obligations and commitments of the Seller under any Contracts, (d) all liabilities and obligations of Seller, including, without limitation, all product warranty claims and any claims for property damage or personal injury, relating to goods sold by Seller to third parties, (e) all liabilities and obligations of Seller for, or in respect of, wages, salaries, benefits and other compensation payable to employees of the Seller, (f) all liabilities and obligations of Seller for, or in respect of, Taxes, (g) all liabilities and obligations of Seller in respect of, or under the terms of, any Employee Benefit Plan or under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended (including any state law with the same or similar purpose), (h) any indebtedness, obligation (including, without limitation, by way of a guaranty) or liability for borrowed money or the deferred purchase price of property, (i) all liabilities, obligations, claims or requirements arising under Environmental Laws, and (j) any severance, termination or other similar payments or benefits (including but not limited to any post-retirement benefits or accrued vacation pay) owed or owning under any severance policy, union contract, employment agreement with any employees (union or non-union), sales agents, distributors or independent contractors employed or leased by Seller,

any liabilities arising under any federal, state or local "plant closing law" including without limitation under the federal WARN Act, or any workers' compensation claims.

"Contracts" means and include all contracts, agreements, commitments and other arrangements of any nature, written or oral to which the Seller is a party or pursuant to which the Seller or any of its assets or properties are bound.

"Customer Information" means all customer lists, credit data and information, historical sales information and specific product or design requirements relating to customers of the Business.

"Deposits" means Seller's prepaid expenses, including prepaid insurance, workers compensation deposits and amounts otherwise on deposit with third parties.

"Employee Benefit Plan" means any current or former (a) Pension Plan, and (b) other plan, contract or arrangement covering present or former employees, officers, or directors (or any of their dependents) of the Seller or of any ERISA Affiliate of the Seller (whether or not sponsored by the Seller or by any ERISA Affiliate of the Seller) providing for bonuses, deferred compensation, excess benefits, special retirement benefits, profit sharing, incentive, severance or vacation pay, hospitalization, health or medical expense benefits or insurance, unemployment benefits, or benefits under any other "employee benefit plan" within the meaning of Section 3(3) of ERISA.

"Encumbrances" shall mean all liens, security interests, mortgages, pledges, assignments of rights, title retention arrangements, options, rights of first refusal or other claims or encumbrances.

"Environmental Laws" means all federal, state and local laws, statutes, ordinances, regulations, orders, consent decrees, doctrines and binding judgments now or hereafter in effect and relating to the regulation and protection of human health, safety, the environment and natural resources including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 et seq.), the Hazardous Material Transportation Act, as amended (49 U.S.C. §§ 1801 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136 et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S. §§ 6901 et seq.), the Toxic Substance Control Act, as amended (42 U.S.C. §§7.401 et seq.), the Clean Air Act, as amended (42 U.S.C. §§ 7401 et seq.), the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 et seq.), the Occupational Safety and Health Act, as amended (29 U.S.C. §§ 651 et seq.) and any state or local or common law corollaries, counterparts or equivalents of any of the foregoing.

"Equipment" means all machinery, equipment, vehicles, parts, supplies, furniture and other items of personal property owned by the Seller or otherwise used in the Business, but excluding Inventory.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"ERISA Affiliate" means any employer that is, or at any relevant time was, together with the Seller, treated as a "single employer" under Code Section 414(b), 414(c), 414(m), or 414(o).

"Excluded Assets" means all assets, properties or rights of the Seller which are not otherwise specifically included within the term "Transferred Assets". Without limitation, the "Excluded Assets" shall include all right, title and interest of Seller in and to:

(a)     all cash;

(b)     to the extent not otherwise Transferred Contracts, all Contracts;

(c)     all right, title and interest in, to and under all insurance policies, all premiums refundable thereunder and recoveries related thereto or with respect thereto and all monies payable thereunder, excluding, however, insurance proceeds of property insurance and/or business interruption insurance relating to the Florida Facility from losses incurred prior to the Closing Date;

(d)     all rights, claims and choses in action against third parties related to the assets, properties and rights of Seller or the conduct of the Business, in each instance, to the extent arising out of transactions prior to the Closing Date, including but not limited to any claim or cause of action under Chapter 5 of the Bankruptcy Code;

(e)     all payroll and accounting records and all corporate records in the nature of corporate record books and related minutes, tax returns and similar reports or records; and

(f)     all property records, production records, environmental compliance records and purchasing and sale records, but excluding books and records forming a part of the Customer Information or Proprietary Assets.

"Expense Reimbursement Amount" means an amount equal to the actual costs and out-of-pocket expenses incurred by Purchaser in connection with its

legal, environmental, accounting and business due diligence and the preparation and negotiation of this Agreement.

"Facilities" means all of the real property, buildings, structures, fixtures and improvements owned, leased or otherwise used by the Seller in the conduct of its business, including all real property used by Seller for parking.

"Final Order" means an order as to which the time to file an appeal, a motion for rehearing or reconsideration (excluding any motion under Rule 60(b) of the Federal Rules of Civil Procedure) or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"Florida Facility" means the Facility leased by Seller located at 600 Tallevast Road, Suite 201, Sarasota, Florida.

"Hazardous Substances" means: (a) any element, compound or chemical that is defined, listed or otherwise classified as a contaminant, pollutant, toxic pollutant, toxic or hazardous substance, extremely hazardous substance or chemical, hazardous waste, medical waste, biohazardous or infectious waste, special waste, or solid waste as those terms are defined by Environmental Laws, (b) petroleum, petroleum-based and petroleum-derived products, (c) polychlorinated biphenyls, (d) any asbestos containing materials, and (e) any substance exhibiting a hazardous waste characteristic including but not limited to corrosivity, ignitibility, toxicity, reactivity as well as any radioactive or explosive materials.

"Inventory" means all of Seller's inventory, including, without limitation, raw materials, purchased parts, work-in-process, finished goods, shipping materials, supplies and other personal property held for sale or lease or used or consumed in the manufacture of finished goods.

"Pension Plan" means a pension plan, retirement payment plan, other defined benefit or contribution plan and each "employee pension benefit plan" under Section 3(2) of ERISA covering any present or former employees of the Seller, or of any ERISA Affiliate of the Seller (whether or not such plan is sponsored by the Seller or by any ERISA Affiliate of the Seller).

"Person" shall mean any individual, sole proprietorship, firm, corporation (including any non-profit corporation and public benefit corporation), general or limited partnership, limited liability partnership, joint venture, limited liability company, estate, trust, association, organization, labor union, institution, entity or governmental authority, including any successor (by merger or otherwise) of such entity.

"Proprietary Assets" means all right, title and interest of Seller in and to (a) the name "Haemacure", and any and all variations thereof, (b) the domain name haemacure.com and any and all other Internet domain names or URL's related to the Business and all variations thereof, (c) all patents, patent

applications, inventions, trade names, trademarks, trademark applications, service marks, service mark applications, theme concepts, copyrights, copyright applications, trade secrets, shop rights, know-how, engineering drawings and records, business plans and strategies, proprietary processes and formulae, clinical trial protocols and results, batch records, databases, and all other proprietary technical information, whether patentable or unpatentable, related to the products, services or operations of the Business as presently conducted by the Seller, or as contemplated to be conducted by the Seller, including, without limitation, those related to Seller's plasma protein extraction technology and resulting products and potential products, and (d) all Regulatory Approvals.

"Purchase Documents" means, collectively, this Agreement and each of the other agreements, instruments and documents required to be executed pursuant to the terms of this Agreement.

"Purchase Price" means an amount equal to $1,500,000 to be paid to Seller as provided in Section 2.05 hereof.

"Purchaser Loan Obligations" means all amounts owing by Seller to Purchaser as of the Closing Date on account of (a) advances pursuant to the Senior Secured Convertible Bridge Loan Agreement dated as of June 1, 2009 between Purchaser, as lender, Haemacure-Canada, as borrower, and Seller, as guarantor, as modified and supplemented by the Forbearance Agreement dated as of January 8, 2010, among Purchaser, Haemacure-Canada and Seller and (b) advances made by Purchaser to Seller in Seller's bankruptcy case pursuant to section 364 of the Bankruptcy Code, in each case together with interest and other charges accrued thereon.

"Regulatory Approvals" means any and all 510(k) clearances, medical device establishment registration, blood establishment registration, medical device listing, blood product listing, investigational new drug ("IND") application, biologics license application or foreign equivalents of any of the foregoing or any other U.S. or foreign governmental authorization, including any pending applications, registrations or notices for such registrations or approvals including, but not limited to, such Regulatory Approvals listed on **Schedule 1.01(a)** attached hereto.

"Retained Liabilities" means those liabilities and obligations of the Seller, the liability for which is to be retained by the Seller as provided under the provisions of Section 2.04 hereof.

"Sale Motion" means a motion filed by Seller with the Bankruptcy Court requesting that the Bankruptcy Court issue an order which (a) authorizes the sale of the Transferred Assets to Purchaser, Purchaser's assumption and discharge of the Assumed Liabilities and the consummation otherwise of all transactions contemplated herein pursuant to the terms set forth herein, (b) provides that the Transferred Assets shall be transferred and assigned to Purchaser free and clear of

all Encumbrances, (c) confirms that Purchaser is acquiring the Transferred Assets free and clear of the Retained Liabilities and provide for a full release of Purchaser with respect to the Retained Liabilities, (d) finds that Purchaser has acted in "good faith" in connection with the transactions contemplated herein, as provided in §363(m) of the Bankruptcy Code, and that all conditions and terms of §363(f) of the Bankruptcy Code and the Bankruptcy Rules which are applicable thereto have been satisfied, (e) finds that Purchaser is not a "joint employer" of Seller's employees for purposes of the National Labor Relations Act or otherwise, (f) binds any successor in interest, including any trustee which may be appointed in Seller's bankruptcy proceeding or any subsequent proceeding under the Bankruptcy Code, to the terms and conditions of this Agreement, as they may be modified, (g) authorizes Seller to pay the Expense Reimbursement Amount under the terms set forth in <u>Section 8.02</u> hereof, and (h) authorizes the Seller to take all steps and actions necessary to perform each and all of its obligations under the terms and conditions of this Agreement.

"<u>Sale Order</u>" means an order of the Bankruptcy Court which shall, unless Purchaser otherwise agrees, grant the Sale Motion in its entirety.

"<u>Taxes</u>" means all liabilities and obligations of Seller for, or in respect of, all income, gross receipts, sales, use, employment, franchise, profits, property or other taxes, assessments, fees, duties or other charges of any kind whatsoever, whether payable directly or by withholding, together with any interest, penalties, additions to tax or other additional amounts, imposed or levied by any foreign or domestic taxing authority, federal, state or local.

"<u>Transferred Assets</u>" means all right, title and interest of the Seller in and to the assets owned or used by Seller in connection with the Business (other than the Excluded Assets) and including, without limitation, the Deposits, Equipment, Inventory, Transferred Contracts, Proprietary Assets and all Customer Information.

"<u>Transferred Contracts</u>" means the Contracts, if any, listed on **Schedule 3.01(g)** hereto.

Section 1.02   <u>Accounting Terms</u>.   Except to the extent otherwise defined herein, accounting terms used in this Agreement shall have the meanings customarily given to them in accordance with generally accepted accounting principles.

Section 1.03   <u>Plural Forms</u>.   All definitions shall be equally applicable to both the singular and plural forms of the defined terms.

## ARTICLE II

## PURCHASE AND SALE

Section 2.01   <u>Closing</u>.   Subject to the terms and conditions of this Agreement, the purchase and sale of the Transferred Assets as contemplated hereby shall take place at a closing

(the "Closing") at 10:00 a.m., local time, at the offices of Squire, Sanders & Dempsey, L.L.P., One Tampa City Center, 201 N. Franklin Street, Suite 2100, Tampa, Florida 33602, unless another time or place is mutually agreed upon in writing by the Purchaser and Seller, on the third (3rd) business day following the date on which the Sale Order becomes a Final Order, unless Purchaser elects an earlier date by delivery of no less than three (3) business days advance written notice to Seller (the "Closing Date").

Section 2.02    Purchase and Sale.  Subject to the terms and conditions set forth in this Agreement, on the Closing Date, the Seller shall sell, transfer, convey and assign the Transferred Assets to Purchaser (or an affiliate of Purchaser designated for that purpose), and the Purchaser shall purchase the Transferred Assets from the Seller.  Notwithstanding anything to the contrary otherwise set forth in this Agreement, the Excluded Assets shall remain the sole property of the Seller.

Section 2.03    Assumption of Certain Company Liabilities.  In consideration of the sale, transfer, conveyance and assignment of the Transferred Assets to Purchaser as contemplated hereby, the Purchaser (or an affiliate of Purchaser designated for that purpose) shall (i) pay the Purchase Price as provided in Section 2.05 below, (ii) assume, perform, pay, honor and discharge all liabilities, obligations and commitments of the Seller arising under the Transferred Contracts, if any, to the extent relating to periods following the Closing Date; provided, however, that such obligations, liabilities and commitments shall not have arisen as a result of actions or inactions of Seller that constituted, or given the passage of time would have constituted, a breach or default, (iii) cure any defaults under the lease of the Florida Facility described in **Schedule 3.01(g)** hereto, and (iv) waive any deficiency claim against Seller in the U.S. bankruptcy proceeding; provided, however, such waiver shall not release or limit any claim Purchaser may have against Haemacure-Canada.

Section 2.04    Retained Liabilities.  Except as specifically set forth in Section 2.03 above relative to the Assumed Liabilities, the Seller shall retain and remain liable for all of the Company Liabilities.

Section 2.05    Payment of Purchase Price.  Subject to the terms and conditions of this Agreement, and in consideration of the aforesaid sale and transfer of the Transferred Assets, the Purchaser shall pay the Purchase Price to the Seller on the Closing Date, (i) by credit against amounts owing to Purchaser with respect to the Purchaser Loan Obligations plus (ii) $100,000 for payment of allowed claims of creditors of the Seller in immediately available funds, in each case in a manner consistent with the terms of the Sale Order.  In the absence of a requirement in the Sale Order, any cash amounts shall be wired to an account, and pursuant to wire instructions, designated by the Seller prior to the Closing Date.

Section 2.06    Allocation.  The Purchase Price shall be subject to allocation by the Purchaser in such manner as it determines reasonably appropriate to the extent consistent with any applicable Internal Revenue Service guidelines.  All federal, state and local tax returns filed after the Closing Date by either Seller or Purchaser, including, without limitation, IRS Form 8594, will contain valuations which are consistent with the purchase price allocation as so determined.

Section 2.07    Non-Effect of Disclosure.  The parties acknowledge and agree that, except where such disclosed obligation has been expressly assumed by Purchaser as part of the Assumed Liabilities in accordance with the provisions of Section 2.03 hereof, the disclosure of any liability or obligation of the Seller, or any predecessor(s) or affiliate(s) of the Seller, or for which the Seller or any predecessor(s) or affiliates of the Seller could be liable, on any Schedule to this Agreement shall not create, or give rise to, any liability of Purchaser in respect of such liability or obligation.

Section 2.08    Deemed Consents.  For all purposes of this Agreement (including all representations and warranties of the Seller contained herein), the Seller shall be deemed to have obtained all required consents in respect of the assignment of any Transferred Contract if and to the extent that the Seller is authorized to assume and assign the Transferred Contract to Purchaser pursuant to Section 365 of the Bankruptcy Code and the Sale Order or other order of the Bankruptcy Court.

Section 2.09    Disclaimer of Implied Warranties.  PURCHASER ACKNOWLEDGES THAT, EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN ANY DOCUMENT, INSTRUMENT OR AGREEMENT EXECUTED BY THE SELLER IN CONNECTION WITH THIS AGREEMENT OR WITH THE TRANSACTIONS CONTEMPLATED HEREBY, AND TO THE EXTENT OTHERWISE PERMITTED BY LAW, SELLER IS SELLING THE TRANSFERRED ASSETS ON AN "AS IS, WHERE IS" BASIS AND THE SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE WITH RESPECT TO THE TRANSFERRED ASSETS OR THE BUSINESS INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Section 3.01    Representations and Warranties by Seller.  Seller hereby represents and warrants as follows:

(a)    Due Organization; Power and Authority.  The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and is in good standing and duly qualified to conduct business as a foreign corporation in the State of Florida.  Seller has all requisite corporate power and authority to carry on its business as presently conducted.

(b)    Authorization; Binding Effect.  The Seller's execution, delivery and performance of this Agreement and the other Purchase Documents to which the Seller is a party, and the consummation of the transactions contemplated hereby and thereby, has been duly authorized by the sole shareholder and board of directors of Seller and all other necessary corporate action on the part of Seller.  Subject to the entry of the Sale Order, this Agreement, and each of the other Purchase Documents to which the Seller is a party, constitute legal, valid and binding obligations of the Seller enforceable in accordance with their terms.

(c) <u>No Conflict</u>. The Seller's execution, delivery and performance of this Agreement and the other Purchase Documents to which the Seller is a party, and the consummation of the transactions contemplated hereby and thereby, will not:

(i) violate or conflict with the Certificate of Incorporation or Bylaws of the Seller; or

(ii) (1) violate any Transferred Contract, (2) result in or constitute a default on the part of Seller (or an occurrence which by lapse of time and/or giving of notice would constitute such a breach or default) under any Transferred Contract or (3) give rise to any right of termination or cancellation under any Transferred Contract; or

(iii) subject to obtaining the approval of the Bankruptcy Court, violate any provision of law, or any provision of any judgment, writ, injunction, decree or order of any court or governmental authority relating in any manner to the Seller or to any of the Transferred Assets.

(d) <u>Consents and Approvals</u>.

(i) Except as may be related to the requirement for obtaining the approval of the Bankruptcy Court, no consents and approvals of third parties and governmental authorities are required to be obtained by Seller in connection with the execution and delivery of the Purchase Documents to which it is a party or the consummation of the transactions contemplated thereby.

(ii) The Seller agrees to cooperate with and assist the Purchaser in transferring or updating Regulatory Approvals to reflect the purchase of Seller's rights and interests therein, in designating a substitute official correspondent (as such term is defined in 21 C.F.R. § 807.3(e)) with respect to U.S. Regulatory Approvals, or otherwise transferring such Regulatory Approvals, together with the Seller's rights under any clinical trial agreement with any Person relating to such Regulatory Approvals, to the Purchaser.

(e) <u>Taxes</u>. All federal, state and local returns and reports, and any foreign returns and reports, required by law to have been filed by the Seller in respect of any Taxes have been duly filed on or before the respective due dates (as extended by any valid extensions of time for filing), and all Taxes which are due and payable by the Seller have been paid. The Seller has, and at the Closing will have, withheld from each of its respective employees for all periods prior thereto proper and accurate amounts in compliance with the tax withholding provisions of all applicable laws, and will have filed proper and accurate returns for all periods and in all jurisdictions for which returns were due with respect thereto, and will have paid in full all amounts shown on each such return to be due and payable and will have made full and adequate

provisions for the payment of all such amounts not yet due and payable. No claim or liability is pending or has been assessed or threatened against the Seller in connection with any Taxes.

(f) <u>Title</u>. Subject to the Bankruptcy Court's entry of the Sale Order, Purchaser will, at the Closing, receive good and marketable title to, and the valid and enforceable right to use, all of the Transferred Assets, free and clear of all mortgages, pledges, liens, security interests, encumbrances, claims and restrictions (other than the lease of the Florida Facility).

(g) <u>Transferred Contracts</u>. **Schedule 3.01(g)** attached hereto sets forth a true and complete list of all Transferred Contracts. No Transferred Contract is an affiliate Contract. All copies of any such Transferred Contracts which Seller has provided to Purchaser are true, accurate and complete in all material respects.

(h) <u>Environmental</u>. To the knowledge of Seller, since January 1, 1980, and except as disclosed in **Schedule 3.01(h)**, with respect to all of Seller's operations:

(i) Seller is in material compliance with all applicable Environmental Laws and any permits issued thereunder;

(ii) Seller has not received notice of any violation of or claim arising under Environmental Laws; and

(iii) Seller is not aware of any sites where Seller has either directly or indirectly disposed of Hazardous Substances which is otherwise currently listed on the National Priorities List or the Comprehensive Environmental Response, Compensation and Liability Information System or any comparable state or federal list.

Section 3.02 <u>Representations of Purchaser</u>. Purchaser represents and warrants to Seller as follows:

(a) <u>Due Organization; Authority</u>. Purchaser is a corporation duly organized and validly existing and in good standing under the laws of the Province of British Columbia, with full power and authority to enter into and carry out its obligations under this Agreement and each of the other Purchase Documents to which it is a party.

(b) <u>No Conflict</u>. Neither the execution of this Agreement or any of the other Purchase Documents to which the Purchaser is a party, nor performance thereof, will violate the Notice of Articles or Articles, or any material indenture, contract or other commitment to which it is a party or by which it is otherwise bound, nor will such execution or performance result in or constitute a default on the part of Purchaser (or an occurrence which by the lapse of time and/or giving of notice would constitute such a breach or default) under any such material indenture, contract or other commitment.

(c) <u>Binding Effect; Authorization</u>. This Agreement, and each of the other Purchase Documents to which the Purchaser is a party, constitutes the valid and binding obligation of Purchaser, and all such Purchase Documents, and the consummation of the

transactions contemplated thereby, have been duly authorized on behalf of Purchaser by all requisite corporate action.

## ARTICLE IV

## ADDITIONAL AGREEMENTS

Section 4.01   Conduct of Business by the Seller.   Between the date of this Agreement and the Closing Date, Seller shall, except as otherwise directed by the Bankruptcy Court, conduct the Business in the ordinary course and consistent with past practices, and shall use its reasonable efforts to preserve substantially intact its business organizations, keep available the services of its present officers and employees and preserve in all material respects its present business relationships and goodwill.

Section 4.02   Further Action.   Each of the parties hereto shall execute such documents and other papers and take such further actions as may be reasonably required or desirable to carry out the provisions hereof and consummate the transactions contemplated hereby. Upon the terms and subject to the conditions hereof, each of the parties hereto shall use its best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all other things necessary, proper or advisable to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement and to obtain in a timely manner all necessary waivers, consents and approvals and to effect all necessary registrations and filings.

Section 4.03   Publicity.   All notices to third parties and all other publicity concerning the transactions contemplated hereby shall be jointly coordinated and approved by the Seller and Purchaser and no party shall act unilaterally in this regard, provided, however, that the foregoing provisions shall not be deemed to preclude (a) any notice given by Seller to any Person whose consent or other action is required to be obtained or taken in connection with the consummation of the transactions contemplated hereby, (b) communications made in confidence by either Seller or Purchaser to its respective advisors, employees and lenders or (c) communications or notices otherwise required to be provided by law or the Bankruptcy Court.

Section 4.04   Employees.   Purchaser has no obligation hereunder to hire any of the Seller's employees. To the extent this transaction triggers any notice requirements or liability to the Seller's employees under the Worker Adjustment and Retraining Notification Act (WARN), the Seller shall retain and assume all WARN notification requirements and shall retain and assume all liabilities, with respect to all of Seller's employees for the provision of notice or payment in lieu of notice or any applicable penalties under the WARN Act or under any similar state, local or foreign law as a result of or arising from this transaction. Notwithstanding the foregoing, Purchaser intends to extend offers of employment to Ken Smith, Dawn Benson and Lynn Carr and may, in its sole and absolute discretion, offer employment to some or all other employees of Seller.

Section 4.05   Due Diligence Review.   From the date hereof through the Closing Date, the Seller shall provide Purchaser and its officers, employees and agents with reasonable access, during normal business hours and upon reasonable notice, to all of the Seller's properties, offices, plants and other facilities and to all relevant books and records, financial and operating data and

other information regarding the Business, including, without limitation, customer lists, supplier lists, pricing policies, marketing programs, product information and the like, that Purchaser may from time to time reasonably request; provided, that, (a) no investigation pursuant to this Section 4.05 shall affect any representations or warranties made herein or the conditions to the obligations of the respective parties to consummate the transactions contemplated by this Agreement and (b) nothing herein shall require that the Seller provide access or furnish information which it is prohibited by applicable law or contract to otherwise provide or furnish.

Section 4.06  Opportunity to Review.   The Seller will provide Purchaser with a reasonable opportunity to review and comment upon all motions, applications and supporting papers prepared by the Seller and relating to this Agreement (including forms of proposed orders and notices to interested parties) prior to the filing thereof with the Bankruptcy Court, including, without limitation, the proposed form of Sale Order. All motions, applications and supporting papers prepared by the Seller relating to the approval of this Agreement (including forms of proposed orders and notices to interested parties) to be filed on behalf of the Seller after the date hereof must be acceptable in form and substance to Purchaser, in its reasonable discretion. The Seller shall have otherwise provided Purchaser with prompt notice of all motions filed by any person pertaining to or affecting the sale of the Transferred Assets or any of the other transactions involving Purchaser.

Section 4.07  Exclusivity; No Solicitation of Other Proposals.   Except as otherwise required by order or direction of the Bankruptcy Court, the Seller shall not participate in negotiations, or otherwise enter into any agreement, arrangement or understanding relating to any Alternative Transaction, regardless of whether such offer or proposal was unsolicited.

Section 4.08  Additional Contracts.  During the period from the date of this Agreement until the Closing Date, Seller will not enter into any Contract which, by its nature, would otherwise constitute a Transferred Contract unless (a) such Contract has been entered into in the ordinary course of Seller's business and does not involve an expenditure or sale involving an amount in excess of $10,000 individually or $25,000 in the aggregate or (b) such Contract has, prior to its execution or acceptance by Seller, been approved or consented to by Purchaser. Unless so approved, or consented to, any such Contract executed or accepted by Seller, except for Contracts described in clause (a) above, shall, at the option of Purchaser, be subject to exclusion from the Transferred Contracts assigned to Purchaser at the time of Closing.

Section 4.09  Filing of Petition and Sale Motion.   Seller agrees to file the Sale Motion within five (5) business days following the execution of the Agreement and to use its reasonable best efforts to seek the expeditious approval thereof.

## ARTICLE V

## CONDITIONS TO PURCHASER'S OBLIGATIONS

Unless waived, in whole or in part, in writing by Purchaser, the obligations of Purchaser hereunder, including any obligation to close the transactions contemplated hereby, are subject to the fulfillment of each of the following conditions set forth in this Article V:

Section 5.01    Representations and Warranties.  The representations and warranties of the Seller set forth in this Agreement shall be true and correct in all material respects as of the time of Closing and all modifications thereto, if any, shall be satisfactory to Purchaser in all material respects.

Section 5.02    Compliance with Covenants.  The Seller shall have (a) performed all of the obligations required to be performed by it hereunder and (b) complied, in all material respects, with all of the covenants contained herein required to be complied with or performed by it on or prior to the date of Closing.

Section 5.03    No Litigation.  At the time fixed for Closing, there shall be no pending or threatened Action against the Seller or Purchaser for the purpose of enjoining or preventing the consummation of this Agreement or otherwise claiming that this Agreement or the consummation of the transactions contemplated hereby or thereby, is improper.

Section 5.04    Bankruptcy Proceedings.

(a)    Seller shall have filed the Petition and Sale Motion with the Bankruptcy Court.

(b)    All entities (the "Notified Entities") required to receive notice under the Bankruptcy Code and Bankruptcy Rules, including any entities asserting claims against any of the Transferred Assets, all taxing authorities, and all parties to the Transferred Contracts other than the Seller, as required by the Bankruptcy Code and the Bankruptcy Rules shall have been provided with notice of the Sale Motion on a timely basis in the manner required under the related provisions of the Bankruptcy Code or by order of the Bankruptcy Court.

(c)    None of the Notified Entities shall have objected to the sale of the Transferred Assets contemplated by this Agreement or, if any has objected, its objection shall have been overruled or disallowed by the Bankruptcy Court or otherwise settled to the reasonable satisfaction of Purchaser.

(d)    The Bankruptcy Court shall have issued the Sale Order and the same shall have become a Final Order.

Notwithstanding the provisions of this Section 5.04, nothing in this Agreement shall preclude Purchaser or the Seller from consummating the transactions contemplated herein if Purchaser, in its sole discretion, waives the requirement that the Sale Order shall have become a Final Order.  No notice of such waiver of this or any other condition to Closing need be given except to the Seller, it being the intention of the parties hereto that Purchaser shall be entitled to, and is not waiving, the protection of Section 363(m) of the Bankruptcy Code, the mootness doctrine and any similar statute or body of law if the Closing occurs in the absence of a Final Order.

Section 5.05    Canadian Bankruptcy Proceedings.  Haemacure-Canada shall have commenced the BIA proceeding and Purchaser shall have obtained title to the assets of Haemacure-Canada free and clear of all liens, claims and encumbrances.

Section 5.06  Additional Matters.  At the time of Closing, (a) Purchaser shall have received such additional documents, instruments or items of information reasonably requested by it in respect of any aspect or consequence of the transactions contemplated hereby and (b) all corporate and other proceedings, and all documents, instruments and other legal matters, in connection with the transactions contemplated by this Agreement or by the other agreements referred to herein shall be reasonably satisfactory in form and substance to Purchaser and its counsel.

If any of the conditions set forth in this Article V are not satisfied, Purchaser may elect to proceed with the Closing without such satisfaction or, subject to the provisions of Article VIII hereof, may elect to terminate this Agreement without liability.

## ARTICLE VI

## CONDITIONS TO THE SELLER'S OBLIGATIONS

Unless waived, in whole or in part, in writing by the Seller, the obligations of the Seller hereunder, including any obligation to close the transactions contemplated hereby, are subject to fulfillment of each of the following conditions:

Section 6.01  Representations and Warranties.  The representations and warranties of Purchaser set forth in this Agreement shall be true and correct as of the time of Closing.

Section 6.02  Compliance with Covenants.  Purchaser shall have performed all of the obligations required to be performed by it hereunder and complied with all of the covenants contained herein required to be complied with or performed by it on or prior to the Closing Date.

Section 6.03  No Court Order.  At the time fixed for Closing, no order shall have been issued restricting, prohibiting or staying the consummation of the transactions contemplated hereby.

Section 6.04  Assumption Documents.  At the time fixed for Closing, Purchaser shall have delivered to the Seller such instruments of assumption as the Seller may, in its reasonable judgment, determine necessary to evidence Purchaser's assumption of the Assumed Liabilities as herein provided, in form satisfactory to the Seller.

Section 6.05  Sale Order.  At the time fixed for Closing, the Bankruptcy Court shall have entered the Sale Order on its docket.

Section 6.06  Payment.  At the time fixed for Closing, Purchaser shall have paid the full amount of the Purchase Price to the Seller pursuant to the provisions of Section 2.05 hereof.

In the event that any of the conditions set forth in this Article VI are not satisfied, the Seller may elect to proceed with the Closing without such satisfaction or, subject to the provisions of Article VIII hereof, to terminate this Agreement, without liability.

# ARTICLE VII

## CONDUCT AFTER CLOSING

Section 7.01  Taxes.  Subject otherwise to the terms of the Sale Order, all state and local taxes, in the nature of any sales, use or stamp taxes, if any, imposed by reason of the transfer of the Transferred Assets to Purchaser under the terms of the Agreement will be paid by Seller.

Section 7.02  Future Cooperation.  The Purchaser and Seller will cooperate with the other, and will use all reasonable efforts to have its respective officers, directors and other employees cooperate, in furnishing information, evidence, testimony and other assistance in connection with any action, proceeding, arrangement or dispute involving the other party to the extent based upon the transactions contemplated hereby or the operations of the Business prior to the Closing Date.

Section 7.03  Further Assurances.  Upon the request of Purchaser, Seller will acknowledge and deliver all such further acts, deeds, assignments, transfers and assurances as may be reasonably required to convey, transfer and vest in Purchaser title to the Transferred Assets.

Section 7.04  Name Change.  Promptly following the Closing, Seller shall amend its Certificate of Incorporation to change its corporate name in such a manner so that the same shall not contain the words "Haemacure" or any derivations thereof, or otherwise be confusingly similar to its current corporate name.  Seller shall otherwise execute any such consents as may be requested by the Purchaser in order to permit the Purchaser to use the Seller's corporate name in connection with the operation of the Business following Closing.

Section 7.05  Trade Secrets and Confidential Information.  The Seller acknowledges that all Confidential Information is included in the Transferred Assets and, following the Closing, shall be the sole property of Purchaser.  The Seller further acknowledges that disclosure of the Confidential Information to any other individuals, companies or persons would enable such persons to compete with Purchaser in a manner likely to cause Purchaser irrevocable harm. Accordingly, the Seller hereby irrevocably agrees that neither it, nor any of its affiliates, will, other than as expressly permitted by Purchaser (a) disclose, directly or indirectly, any of the Confidential Information to any individual, firm, company, or other entity or (b) use any of the Confidential Information for any purpose.

For purposes hereof, the term "Confidential Information" shall mean any nonpublic information of Seller (including rights to use any such Confidential Information of Haemacure-Canada), including information directly or indirectly relating to the businesses, operations, assets both tangible and intangible, liabilities, financial conditions and projections, products, markets, plans, strategies, processes, know-how, techniques, past, present or future research, business contracts and records, costs and prices, customers, suppliers, employees, consultants, technologies, marketing and promotional activities, methods of doing business, special needs of current, prior or prospective customers and trade secrets of Seller.  The term "Confidential Information" shall also include the Master Collaboration Agreement, the Drug-Loaded Fibrin Sealant License, Development and Collaboration Agreement, the Fibrin Sealant Distribution

Agreement, and the Thrombin License and Supply Agreement, each dated as of June 1, 2009, between Purchaser, Haemacure-Canada and Seller, as from time to time restated, modified or amended.

Section 7.06   <u>Injunctive Relief</u>.   The Seller acknowledges that Purchaser has a legitimate business interest within the meaning of <u>Florida Statutes</u>, § 542.335 in protecting the Confidential Information acquired under this Agreement and that Purchaser has no adequate remedy at law for any breach or threatened or attempted breach of the covenants and agreements set forth in <u>Section 7.05</u> above and, accordingly, the Seller agrees that Purchaser may, in addition to the other remedies that may be available to it hereunder or at law, commence proceedings in equity for an injunction temporarily or permanently enjoining the Seller and its affiliates from breaching or threatening or attempting any such breach of such covenants and agreements and to require compliance with such covenants and agreements. For purposes of any such proceeding in equity, it shall be presumed that the remedies at law available to Purchaser would be inadequate and that Purchaser would suffer irreparable harm as a result of the violation of any provision hereby by the Seller or its affiliates.

Section 7.07   <u>Preservation and Access to Records after the Closing</u>.   After the Closing, Purchaser shall, for a period of three (3) years, keep and preserve all records of Seller existing as of the Closing and which constitute a part of the Transferred Assets delivered to Purchaser at Closing. Upon reasonable notice, during normal business hours, at Seller's sole cost and expense, Purchaser shall afford to the representatives of Seller, including its counsel and accountants, full and complete access to, and, as reasonably requested, copies of, the records transferred to Purchaser at the Closing. Any access to such records granted to Seller in this Agreement shall be upon the conditions that (i) the persons seeking such access execute a Confidentiality Agreement in form acceptable to Purchaser acknowledging that such records constitute Confidential Information and (ii) any such access will not materially interfere with the business operations of Purchaser.

## ARTICLE VIII

## TERMINATION

Section 8.01   <u>Termination</u>. This Agreement may be terminated prior to the Closing as follows:

      (a)    by mutual written agreement of Purchaser and the Seller;

      (b)    by either Purchaser or the Seller if there shall be in effect a Final Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

      (c)    by either Purchaser or the Seller (<u>provided</u>, <u>that</u>, the terminating party is not then in material breach of any representation, warranty, covenant or other agreement contained herein) if there shall have been a breach of any of the representations or warranties set forth in this Agreement on the part of the other party, which breach is not cured within thirty (30) days following written notice to the party committing such breach or which breach, by its nature,

cannot be cured prior to the Closing, and which breach, individually or together with all other such breaches, would have a material adverse effect on the Transferred Assets or the Business, in the case of breaches by Seller, or a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby, in the case of breaches by Purchaser;

(d)    by Purchaser if it shall have reasonably determined that one or more conditions set forth in Article V has not been or cannot be fulfilled or satisfied prior to the date specified in such condition (if such condition specifies a date by which such condition must be satisfied);

(e)    by Purchaser if (i) the Seller seeks or supports Bankruptcy Court approval of an Alternative Transaction, (ii) the Seller enters, or agrees to enter, a definitive agreement with respect to an Alternative Transaction, or (iii) the Bankruptcy Court enters an order approving any Alternative Transaction;

(f)    by Purchaser if the Sale Order shall not have been entered by the Bankruptcy Court on or prior to March 1, 2010, provided, that, if the Bankruptcy Court schedules the hearing to approve the Sale Motion on a date after the aforesaid date, Purchaser shall, within twenty-four (24) hours of the date the Bankruptcy Court sets the date for such hearing, either waive this condition or terminate this Agreement and, provided, further, should Purchaser not have responded within such twenty-four (24) hour period, Purchaser shall be deemed to have elected to terminate this Agreement;

(g)    by Purchaser on any day after March 15, 2010 if the Closing shall not have been consummated by such date (or by such later date as shall be mutually agreed to by Purchaser and the Seller in writing), unless the Closing has not occurred due to a material failure of Purchaser to perform or observe its agreements as set forth in this Agreement required to be performed or observed by it on or before the Closing Date; and

(h)    by Seller if the Bankruptcy Court requires that Seller solicit bids as a condition to the sale of the Transferred Assets and (i) Seller determines that an Alternative Transaction is in the best interests of Seller, (ii) the Seller executes and delivers a definitive agreement with respect to an Alternative Transaction, or (iii) the Bankruptcy Court enters a Final Order approving any Alternative Transaction.

Section 8.02    Expense Reimbursement.  In the event a sale of all or substantially all of the Transferred Assets pursuant to an Alternative Transaction is agreed to by Seller within twelve (12) months following the date of this Agreement, and unless such sale has resulted from the fact that (a) this Agreement has been terminated in accordance with terms of Section 8.01(a) above or (b) the Seller has terminated this Agreement under the terms of Section 8.01(c) above, the Seller shall be obligated to immediately pay the Expense Reimbursement Amount to Purchaser in immediately available funds, provided, that, Seller may defer such payment until the closing of the Alternative Transaction, for a period not to exceed forty-five (45) days.  The Seller's obligation to pay the Expense Reimbursement Amount shall survive termination of this Agreement and shall constitute an administrative expense (which shall be a super-priority administrative expense claim senior to all other administrative expense claims).

Section 8.03    Effect of Termination or Breach.    If this Agreement is terminated in accordance with Section 8.01 hereof and the transactions contemplated hereby are not consummated, this Agreement shall become null and void and of no further force and effect, provided, that, (i) the provisions of this Section 8.03 and the provisions of Section 8.02 hereof shall remain effective notwithstanding any such termination, and (ii) the termination of this Agreement for any cause shall not relieve any party hereto from any liability which at the time of termination had already accrued to any other party hereto or which thereafter may accrue in respect of any act or omission of such party prior to such termination, except that the payment of the Expense Reimbursement Amount shall be sole compensation to Purchaser if an Alternative Transaction is completed.

## ARTICLE IX

## MISCELLANEOUS

Section 9.01    Brokers' or Finders' Fees.    Each of the parties (a) represents and warrants that there are no claims for brokerage commissions or finders' fees in connection with the transaction contemplated hereby and (b) agrees that it will indemnify and hold harmless the other from and against, any and all claims for such commissions or fees payable by such party or as may be otherwise incurred by reason of action taken by the indemnifying party.

Section 9.02    Expenses.    Except as otherwise provided in Section 8.02 hereof, all expenses incurred by or on behalf of the parties in connection with the negotiation, execution and performance of this Agreement, including the fees and expenses of counsel, auditors, and appraisers, shall be paid by the party so incurring such expense.

Section 9.03    Amendment.    This Agreement may be amended or modified at any time and in all respects by an instrument in writing executed by the respective parties hereto.

Section 9.04    Assignment.    Neither this Agreement nor any right created hereby shall be assignable by either the Seller or the Purchaser without the prior written consent of the other. Nothing in this Agreement, expressed or implied, is intended to confer upon any person, other than the parties hereto and their successors and permitted assigns, any rights or remedies under or by reason of this Agreement.

Section 9.05    Notice.    Any notice, communication, request, reply or advice (hereinafter severally and collectively called "notice") in this Agreement provided or permitted to be given, made or accepted by either party to the other must be in writing and given or be served by depositing the same in the United States mail, addressed to the party to be notified, postage prepaid and registered or certified with return receipt requested or by delivering the same in person to such party. Notice deposited in the mail in the manner hereinabove described shall be effective only if and when received by the parties to be notified. For purposes of notice the address of the parties shall, until changed as hereinafter provided, be as follows:

If to Seller:

> HAEMACURE CORPORATION
> c/o HAEMACURE CORPORATION
> 215 Avenue Redfern, Suite 100
> Westmount, Province of Québec, H3Z 3L5
> Canada
> Attention: President

With a copy to:

> HAEMACURE CORPORATION
> 215 Avenue Redfern, Suite 100
> Westmount, Province of Québec, H3Z 3L5
> Canada
> Attention: Secretary

With a copy to:

> STICHTER, RIEDEL, BLAIN & PROSSER, P.A.
> 110 East Madison Street
> Suite 200
> Tampa, Florida 33602
> Attention: Charles A. Postler

or at such other addresses as the Seller may have advised the Purchaser in writing; and

If to Purchaser:

> ANGIOTECH PHARMACEUTICALS, INC.
> 1618 Station Street
> Vancouver, BC V6A 1B6
> Canada
> Attention: Jon Chen, VP, Business Development and Financial Strategy

With a copy to:

> ANGIOTECH PHARMACEUTICALS, INC.
> PO Box 2840
> 101 W. North Bend Way, Suite 201
> North Bend, WA 98045
> U.S.A.
> Attention: David D. Phinney, VP, Legal

With a copy to:

SQUIRE, SANDERS & DEMPSEY L.L.P.
One Tampa City Center
201 N. Franklin Street, Suite 2100
Tampa, Florida 33602
Attention: David L. Lapides

or at such other addresses as the Purchaser may have advised the Seller in writing.

Section 9.06    Counterpart Execution.  This Agreement may be executed in two or more counterparts, any of which may be executed and delivered via facsimile or other electronic delivery, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 9.07    Waiver.  Except as otherwise expressly provided herein, the failure of any party at any time or times to require performance of any provision hereof shall not in any manner effect a waiver of the right to enforce the same absent an express waiver in writing relating thereto.  No waiver by any party of any condition, or of the breach of any term, provision, covenant, representation or warranty herein contained, whether by conduct or otherwise, in any one or more instances shall be deemed to be or construed as a further or continuing waiver of any such condition or breach nor a waiver of any other condition or of the breach of any other term, provision, covenant, representation or warranty.

Section 9.08    Binding Effect.  All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns.

Section 9.09    Entire Agreement.  This Agreement, together with the other documents and agreements expressly referred to herein and any schedules attached to this Agreement, constitutes the entire agreement between the parties hereto, supersedes all prior agreements and understandings relating to the subject matter hereof, and there are no agreements, understandings, restrictions, warranties or representations between the parties other than those set forth herein or herein provided for and any contemporaneously executed supplements hereto.

Section 9.10    Titles and Subtitles.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

Section 9.11    Severability.   If any provision of this Agreement is held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

Section 9.12    United States Currency.  Unless otherwise specified herein, all amounts and values referred to in this Agreement shall be calculated in United States Dollars.

Section 9.13   <u>Governing Law</u>.  It is the intention of the parties that this Agreement shall be deemed to have been entered into in Tampa, Florida and that the laws of Florida should govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the parties.

[Signatures Follow]

## SIGNATURE PAGE TO
## PURCHASE AGREEMENT

HAEMACURE CORPORATION

By _Jym Galli_

Name _Joseph Galli_

Title _President_


ANGIOTECH PHARMACEUTICALS, INC.

By _____

Name _____

Title _____

**SIGNATURE PAGE TO
PURCHASE AGREEMENT**

HAEMACURE CORPORATION

By_____
Name_____
Title_____

ANGIOTECH PHARMACEUTICALS, INC.

By_____
Name_ Jonathan Chen
Title_ SVP, Business Development

## SCHEDULE 1.01 (a)

## REGULATORY APPROVALS

K994023      Haemacure HemaMyst Surgical Applicator System

K041504      HemaMyst Surgical Applicator System

IND 6362     HEMASEEL™ HMN Fibrin Sealant

# SCHEDULE 3.01 (g)

## TRANSFERRED CONTRACTS

1. Lease ("Lease") dated October 14, 2005, between Seller and Aldina, L.C., a Florida limited liability company, Trustee ("Landlord") relating to the Florida Facility of Seller located at 600 Tallevast Road, Suite 201, Sarasota, Florida, which Lease has been collaterally assigned to Purchaser as provided in Collateral Assignment of Lease and Agreement dated as of June 1, 2009 between Seller and Purchaser and Consent to Collateral Assignment of Lease dated as of June 1, 2009 between Landlord and Purchaser.

2. Lease No. 165642-01, accepted December 4, 2008, between Seller and Ervin Leasing Company relating to one 26"-34" Variable Automatic Floor Scrubber (SN: 08438988), subject to UCC-1 Financing Statement filed with Delaware Secretary of State.

3. Lease # 737047, dated September 11, 2008, between Seller and Marlin Leasing Corporation relating to one each: New Bizhub C650 (A00H010), RAADF DF-610 (A07H0W0), Stapling Finisher FS-517 (A07R0W1), 2/3 Hole Punch kit (A04F0Y1), Super G3 Fax Kit (15LB) and V care Activation (VCAREACT-0) and CPC Maintenance Contract relating thereto.

4. Seller's rights, if any, under Consulting Agreement dated October 28, 2007 by CROfessionals, LLC and November 1, 2007 by Haemacure-Canada, as supplemented, modified or amended by Consulting Agreement dated August 6, 2008 between CROfessionals, LLC and Haemacure-Canada, as further supplemented by Addendum #1 to Consulting Agreement dated August 6, 2008 executed November 19, 2008 by Haemacure-Canada and November 21, 2008 by CROfessionals, LLC, including the Confidential Disclosure Agreement dated August 24, 2007 incorporated by both such Consulting Agreements.

5. Drug-Loaded Fibrin Sealant License, Development and Collaboration Agreement, dated as of June 1, 2009, between Purchaser, Haemacure-Canada and Seller, as modified or amended.

6. Fibrin Sealant Distribution Agreement, dated as of June 1, 2009, between Purchaser, Haemacure-Canada and Seller, as modified or amended.

7. Master Collaboration Agreement, dated as of June 1, 2009, between Purchaser, Haemacure-Canada and Seller, as modified or amended.

8. Thrombin License and Supply Agreement, dated as of June 1, 2009, between Purchaser, Haemacure-Canada and Seller, as modified or amended.

9. Confidentiality Agreement dated January 22, 2007 between Marc Paquin and Haemacure-Canada and Seller.

10. Non-Competition and Non-Solicitation Agreement dated January 22, 2007 between Marc Paquin and Haemacure-Canada and Seller.

11. Noncompetition and Confidentiality Agreement dated April 5, 2008, between Seller and Dawn Benson.

12. Letter Agreement dated May 26, 2009 from the Seller to Dawn Benson, as agreed and accepted May 27, 2009.

13. Noncompetition and Confidentiality Agreement dated April 6, 2008, between Seller and Ken Smith.

14. Letter Agreement dated May 26, 2009 from the Seller to Ken Smith, as agreed and accepted May 27, 2009.

15. Noncompetition and Confidentiality Agreement dated August 10, 2001, between Seller and Lynn Carr.

16. Consulting Services Agreement (letter agreement) dated May 27, 2008 from Seller to Elaine Whitmore, as agreed to May 30, 2008.

17. Seller's rights, if any, under Confidentiality Agreement dated November 27, 2007 between Hameacure-Canada and Elaine Whitmore.

18. Confidentiality and non-compete agreements between Seller and any officers or employees of Seller not otherwise named in this Schedule (excluding however employment contracts that may contain a confidentiality or non-compete clause).

**SCHEDULE 3.01 (h)**

**ENVIRONMENTAL CLAIMS**

NONE